590 So.2d 947 (1991)
AMERICAN MEDICAL INTERNATIONAL, INC., Palm Beach Gardens Community, Inc., and T.R. Bruce, Jr., Appellants,
v.
Zbigniew SCHELLER, M.D., Appellee.
No. 89-0682.
District Court of Appeal of Florida, Fourth District.
October 9, 1991.
Rehearing, Rehearing and Certification Denied January 24, 1992.
*948 Mark Hicks, Ralph O. Anderson and Bambi G. Blum, of Hicks, Anderson & Blum, P.A., and Kelley, Drye & Warren, Miami, for appellants.
Edna L. Caruso of Edna L. Caruso, P.A., Robert M. Montgomery, Jr., of Montgomery & Larmoyeaux and Jack Scarola of Searcy, Denney, Scarola, Barnhardt & Shipley, West Palm Beach, for appellee.
Rehearing, Rehearing En Banc and Certification Denied January 24, 1992.
PER CURIAM.
Appellants American Medical International, Inc. [AMI], Palm Beach Gardens Community Hospital [Hospital], and T.R. Bruce, Jr. [Mr. Bruce] appeal the final judgment entered in favor of appellee Dr. Zbigniew Scheller [Dr. Scheller]. We affirm.
AMI owned the Hospital which employed Mr. Bruce as its administrator and Dr. Scheller as its pathology laboratory director. In 1979 the Hospital terminated Dr. Scheller's contract and replaced him with Dr. Frederick Hobin [Dr. Hobin]. The bylaws of the Hospital's medical staff contained a provision in the membership section, Article IV § 3(b), which stated:
Regardless of an exclusive contract for Pathology, Radiology or the like, a physician with the consent of the Medical Staff may designate a different medical expert in these fields; and that person so designated shall be afforded the full use of the hospital facilities to do his routine work as requested, in which event the medical expert that does the work shall submit the medical fee statement to the patient or the hospital, as the case may be, and there will not be a double billing.
After his termination, Dr. Scheller solicited members of the medical staff to designate him as their medical expert and he received nearly seventy designations. Dr. Scheller gave notice that he intended to continue to practice clinical and anatomical pathology at the Hospital. He then rendered pathology services for the patients admitted to the Hospital by the doctors that had designated him as their medical expert.
Dr. Scheller charged his designated patients for a particular service, known as a "professional component." He arranged for the laboratory's administrative personnel to segregate the clinical tests reports for his designated patients and to deliver those reports for his "review" at his laboratory work station. By coordinating admission and discharge reports, Dr. Scheller's secretary then requested, for each of the designated patients, those parts of the business office computer printout which listed all of the clinical tests performed. With this information his secretary sent a bill to each patient for the "professional *949 component" associated with each clinical test.
Mr. Bruce stopped these practices, and in 1979 Dr. Scheller sought injunctive relief and damages when he sued appellants for the first time [Scheller I]. The Scheller I trial court issued preliminary injunctions which required the Hospital to furnish Dr. Scheller with copies of the clinical test reports that related to his designated patients and copies of their billing information. Upon entry of those injunctions, the laboratory again segregated the clinical test reports and the business office again provided the billing information to Dr. Scheller.
The preliminary injunctions remained in effect and the Scheller I trial court severed the injunction and damages counts. Dr. Scheller sought damages for the Hospital's denial of his access to the clinical test reports and billing information prior to the entry of the injunctions. This court reversed the judgment Dr. Scheller obtained in Scheller I and remanded with directions to the trial court to enter judgment for appellants. American Medical International, Inc. v. Scheller, 462 So.2d 1 (Fla. 4th DCA 1984), rev. denied, 471 So.2d 44 (Fla. 1985). This Court ruled then that "mere inconvenience" in obtaining the information did not amount to interference and held that Dr. Scheller never proved that any doctor severed his professional relationship with him because the Hospital did not furnish him the test reports or billing records.
In November of 1980, while Scheller I was on appeal, Dr. Scheller voluntarily dismissed the injunction count which dissolved the preliminary injunctions. Two weeks later, Mr. Bruce told the Hospital's laboratory personnel that they should again discontinue segregating and delivering the clinical laboratory reports to Dr. Scheller and instructed the business office to stop providing Dr. Scheller with the billing records.
Based on Mr. Bruce's actions, Dr. Scheller sued appellants a second time and alleged tortious interference with advantageous business relationships [Scheller II].[1] He claimed that for two months in late 1989, appellants deprived him access to the clinical test reports and the billing information. Dr. Scheller also alleged that from July of 1979 to October of 1983 the Hospital double billed his designated patients for clinical tests.
Whether or not Dr. Scheller reviewed a clinical test result, he billed for a "professional component." Dr. Scheller did that in accord with not only the established billing practice of pathologists in Florida, but also the established practice in the majority of the other states. The evidence showed that pathologists were allowed to bill for a "professional component" on clinical tests performed on their patients, even if the pathologist did not review the test. If a test result was normal, the pathologist might never even see it. An abnormal test result might take hours or days of the pathologist's time. However, the pathologist was required to charge each patient the same amount for the same test, regardless of how much time he had to spend on it. In this way, the cost of the professional services for abnormal tests was spread over all the pathology tests performed on the patients.
Dr. Scheller not only billed according to this customary procedure, but when he first began to perform services as a designated medical expert he notified Medicare that he would be directly billing his patients. He obtained a Medicare booklet of allowable charges, which indicated he was entitled to be reimbursed for his "professional component" on every clinical test performed on his patients. Dr. Scheller billed his professional services for clinical tests under Medicare Part B and explained to Medicare exactly what he was doing. Medicare approved his requests for reimbursement, *950 as did private insurance carriers. Dr. Hobin and his successor also admitted that Dr. Scheller billed properly.
The Hospital never informed Medicare that Dr. Scheller as a designated medical expert would be billing patients directly. At that point in time, the Hospital paid Dr. Hobin as laboratory director $10,000 a month or $120,000 a year for all clinical, anatomical, administrative and educational pathology services. Because Dr. Hobin agreed to accept a salary, he could not bill patients directly for a "professional component." The Hospital could bill Dr. Hobin's patients a technical component under Medicare Part A (it's cost of running the laboratory) plus a professional component for Dr. Hobin's services under Medicare Part B.
Instead, the Hospital simply continued to bill patients the same way it had been, intentionally disregarding Dr. Scheller's billing practice. The Hospital billed each of Dr. Scheller's patients for not only the technical component but also the "professional component" for Dr. Hobin's professional services. Had the Hospital attempted to do this under Medicare Part B, the bill would clearly have been rejected by Medicare because Dr. Scheller was the one rendering the medical service. The Hospital obtained payment from Medicare for Dr. Hobin's services by calling his charge a Medicare Part A cost, rather than a charge for "professional component." At trial, appellants tried to justify having done this by recharacterizing the charge for Dr. Hobin's "professional component" as an additional charge for administrative services. However, there was evidence that Mr. Bruce had previously sent Dr. Scheller an October of 1979 letter, at AMI's direction, which stated that each bill the Hospital sent out to Dr. Scheller's patients for clinical services included a "professional component" for Dr. Hobin. This constituted double billing because Dr. Scheller was also billing his patients a "professional component."
Dr. Scheller proved that the denial of access and double billing caused him to lose business relationships with his patients and the doctors who had designated him. The Scheller II trial court ruled that the Hospital bylaws constituted a binding and enforceable contract between the Hospital and its medical staff and that Dr. Scheller was a third party beneficiary of that contract. That trial court observed:
[T]he [appellants] are simply off-the-mark in suggesting that this case is governed by the Supreme Court's decision in AFM Corp. v. Southern Bell Telephone and Telegraph Co., 515 So.2d 180 (Fla. 1987). AFM and its two related cases involve contractual disputes where the aggrieved party had suffered economic loss. Despite [appellants'] assertions to the contrary, this case at bar does not turn upon [Dr.] Scheller's contractual rights with [appellant]/Hospital. Rather, it focuses on allegations of tortious interference with contractual or advantageous business relations that [Dr.] Scheller had with other doctors who maintain privileges at the [appellant] hospital. [Citation omitted.] As such this is a classic tort action not subject to the limitations discussed above.
We agree.
Dr. Scheller also proved that he had been damaged. The evidence established that the denial of access to billing information prevented Dr. Scheller from billing over eleven hundred of his designated patients. Taking his average bill of fifty dollars, Dr. Scheller lost over fifty-seven thousand dollars in revenue. His secretary also testified that the denial of access to billing information had caused problems with Dr. Scheller's patients. There were numerous telephone calls or letters from angry and upset designated patients because they had received bills three to five months after they were discharged from the Hospital. The secretary also testified that some patients refused to pay the bills because they were sent so late.
Dr. Donald Dudan, a gynecologist, testified that he had originally designated Dr. Scheller as his pathologist. However, as a result of Dr. Dudan's patients being double billed by the Hospital, he revoked his designation of Dr. Scheller. Dr. Dudan felt *951 compelled to switch his designation to Dr. Hobin in July of 1980.
Dr. R. Robert Eastridge, a urologist, had also originally designated Dr. Scheller as his pathologist. Later in February of 1981, Dr. Eastridge wrote to the Hospital and advised that he had become aware that the Hospital double billed his patients for a "professional component" on clinical tests, even though he had designated Dr. Scheller as his medical expert. Dr. Eastridge felt that he could not stand by and allow his patients to pay double so he designated Dr. Hobin. Dr. Eastridge redesignated Dr. Scheller in October of 1983. Dr. Scheller lost income from tests performed on over four hundred of Dr. Eastridge's patients, which amounted to charges of nearly twenty-two thousand dollars.
The evidence showed that for four years Dr. Scheller's designated patients and their private insurers or Medicare paid twice for the same service as a result of the Hospital's double billing. One of Dr. Scheller's expert witnesses testified that this was a serious departure from what was allowed, and could be considered false billing or fraud and could subject the Hospital to criminal penalties.
The jury awarded Dr. Scheller nearly one hundred thousand dollars in compensatory damages and over nineteen million dollars in punitive damages. Appellants appeal those jury verdicts.
We hold that Dr. Scheller established by substantial, competent evidence that appellants interfered with the contractual relationship he had with the doctors that had designated him as their medical expert. We also hold that Dr. Scheller established by substantial, competent evidence that he suffered compensatory and punitive damages as the result of appellants' interference.[2]
The enormity of the punitive damages award has not escaped our attention. However, Dr. Scheller established that based on market value appellants had a combined net worth of over one billion dollars. We note that in denying appellants' motions for a new trial, the trial judge remarked:
With respect to the question of the enormity of the wrong and whether the damages are excessive, we have a company that has substantial financial worth. There was testimony that would indicate that the activities here although they were short-lived at least with respect to the denial of access to billing  yes, denial of the access to billing and the lab reports, there is testimony that a jury could have concluded that these activities were part of a much larger picture, part of a picture of a health care corporation bent on gaining control of the hospital and taking various steps to achieve its will.
* * * * * *
The recurrence of the activity after an adverse verdict and the shortness of time, the fact there had been courts that had interpreted the by-laws and had clearly told the hospital what it could and could not do, all of that was before the jury. And, the jury had a right to consider Mr. Bruce's explanation of what his motivation was.
But the point is there was an opposite picture that was put forth, a history of *952 ten years of contentious and antagonistic relationships that had a certain theme to it and I think the jury was fully able to look at that and arrive at its determination as to what was the true motivation behind the hospital's activities and was there a degree of recklessness, and malice and outright revenge that came into play here, and the jury has made that determination.
Furthermore, the supreme court has stated:
[T]he jury is the best judge of the amount necessary to be assessed in order to make an example of ... a defendant and thereby deter him and others from such conduct in the future. The more pecunious the defendant the greater must be the punitive damages assessed in order "to get his attention" regardless of the amount of actual damages awarded the plaintiff. For these reasons we disavow the rule that punitive damages must bear some reasonable relationship to the actual damages awarded by the jury.
Lassitter v. International Union of Op. Engin., 349 So.2d 622, 626 (Fla. 1976).
We also find the remaining issues to be without merit.
AFFIRMED.
POLEN and GARRETT, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with opinion.
ANSTEAD, Judge, concurring in part and dissenting in part.
I concur with the majority opinion in all respects except for the determination that the amount of punitive damages is not excessive. While it is true that the law favors the factfinder's resolution of the punitive damages issue, and does not limit such damages to an amount reasonably related to the compensatory damages awarded, the courts have attempted in recent years to articulate rational factors to be considered in determining the amount of the award. Based upon my review of those factors I conclude that the award here is legally excessive.
NOTES
[1] We review Scheller II for a second time. The trial court dismissed Dr. Scheller's claims for tortious interference with advantageous business relationships and for intentional infliction of emotional distress. This court affirmed the trial court's dismissal of the emotional distress claim, but reversed its dismissal of the tortious interference claim. Scheller v. American Medical International, 502 So.2d 1268 (Fla. 4th DCA), rev. denied, 513 So.2d 1060 (Fla. 1987).
[2] We acknowledge that Dr. Scheller introduced what could be considered unduly prejudicial evidence about AMI "cutting corners" to make a profit from the Hospital. That evidence consisted of nursing shortages, the transfer of a competent nurse out of the intensive care unit, the termination of an emergency room doctor, and the cross-matching of blood that resulted in the death of a patient. However, the trial court repeatedly warned defense counsel not to introduce evidence as to collateral matters. Also, it reminded defense counsel that Dr. Scheller had been restricted as to his proofs and if the defense opened the door, Dr. Scheller would be allowed to respond. Notwithstanding the warnings and reminders, defense counsel asked several witnesses to compare the quality of care in the Hospital and nonprofit hospital which caused Dr. Scheller to respond as he did.

Also, over objection the trial court allowed Dr. Scheller to cross examine one of appellants' expert witnesses with letters written by defense counsel. The letters contained statements that could be considered unduly prejudicial. However, because the expert witness testified that he relied on the letters to form his expressed opinions the trial judge properly overruled the objection.