629 So.2d 947 (1993)
SEARCY, DENNEY, SCAROLA, BARNHART & SHIPLEY, P.A., Appellant,
v.
Zbigniew SCHELLER, Appellee.
No. 92-2539.
District Court of Appeal of Florida, Fourth District.
December 15, 1993.
*948 Joel D. Eaton, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., and Stewart Tilghman Fox & Bianchi, P.A., Miami, for appellant.
Eugene E. Stearns, Lisa K. Bennett and Bradford Swing, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, for appellee.
FARMER, Judge.
This epilogue to our decision in American Medical Intern. Inc. v. Scheller, 590 So.2d 947 (Fla. 4th DCA 1991), essays the folk wisdom that too much success may not be good. Although the subject is attorney's fees, here the warring parties are the prevailing party and his lawyers. With 10 years of litigation, including two trials and four appeals[1] behind them, and a substantial recovery on a $26 million judgment at hand, the price of success had ironically become the occasion for its own controversy.
The first fee agreement executed by the parties in 1982 had provided for 40% of any recovery to the trial lawyers, and 5% for appellate fees. Five years later they executed a modified fee agreement reducing the trial lawyer's fee to 40% on the first $1 million, 30% on the second, and 20% on anything in excess of $2 million. The case then proceeded to trial, resulting in a verdict of more than $19 million. In the midst of post-appeal settlement negotiations, the client [Scheller] discharged his trial attorneys [Scarola] before the supreme court had accepted jurisdiction or entered a stay. The client contends that Scarola tried during the negotiations to extort a new and unreasonable fee agreement to pad his share of the recovery, while Scarola claims that Scheller was trying to avoid paying the agreed fee. After a lengthy trial on the fee dispute, the circuit judge found that Scarola breached the fee agreement during the negotiations and had thus forfeited his entitlement to a fee. Without disturbing the factual findings, which are supported by competent substantial evidence, we reverse his decision as to the appropriate remedy.
Briefly summarized, the trial judge's extensive findings of fact show that, after filing its notice to invoke the discretionary jurisdiction of the supreme court to review our affirmance in the Scheller case, AMI (the losing party) engaged Scarola in settlement negotiations. During what the trial court described as the "critical phase," AMI offered $19.9 million to settle a judgment that was then over $26 million. Rather than concentrating his efforts during this critical time to effect a settlement at that figure  as, indeed, he had been directed by his client to do  Scarola instead sought to pressure his client into signing a new fee agreement, which he refused to do. The moment passed without a settlement, and Scheller discharged Scarola and his firm. Later with a new lawyer, Scheller reached a settlement at $15.5 million, from which Scarola seeks a fee based on the earlier (1982) agreement entitling him to 40% of any recovery.
The history of fee agreements between Scheller and Scarola's firm was recounted by the trial judge. When the matter began in 1979, the parties' written agreement provided for $125 per hour in his dispute with AMI. Then in 1982 the parties signed a new fee agreement providing for the 40% contingency fee [the 1982 agreement]. The 1987 revision occurred, however, when the firm concluded *949 that it had no written agreement, and it thereupon sent Scheller a new fee contract providing for the 40-30-20% contingency fee [the 1987 agreement]. Scheller signed the 1987 agreement and returned it to Scarola's firm, where he then executed the contract on the firm's behalf. The case was tried two years later in 1989.
In this fee dispute, Scarola contended that the 1987 contract was made and executed in error through a mistake in the firm's book-keeping department. Scheller contended, however, that it was no mistake and that it was made and executed to conform the parties' agreement to a change in Florida Bar rules governing contingency fee agreements.[2] Although the trial judge expressly found that Scheller reasonably believed that the 1987 revision had superseded the earlier 1982 contract, he did not make a specific finding as to which contract controlled the fees. Indeed he also found that the 1987 revision arose from sloppy procedures and through error.
When the settlement was first proposed by AMI, Scarola caused Scheller to believe that his fee from any settlement would be $11.79 million, or 45%[3] of the total judgment, which by then had grown to $26.2 million. During settlement discussions, he later suggested that the firm was entitled also to 45% of "all valuable benefits," in addition to cash recovered, that his legal services had conferred on the client during the long litigation. He ultimately asked Scheller to sign a new agreement memorializing such an understanding.
Scheller responded that he would not sign a new agreement to that effect but that he would pay Scarola and his firm 45% of the money actually recovered [the recovery] and nothing more. During the critical time period of intense settlement negotiations, Scarola took the position that Scheller was trying to avoid paying his agreed fee by refusing to sign the new agreement. In effect, Scarola sought to fragment the litigation for fee purposes into separate parts and contended that the extant fee agreements did not cover all of the parts. This came at a time when AMI was insisting on a settlement of all claims and demands. Hence, Scarola wrote Scheller an ultimatum, giving him three alternatives: 1) acknowledge in writing that the 45% agreement covered all facets of the Scheller/AMI litigation; 2) sign a new contract; or 3) get another lawyer. At this point, Scheller discharged him.
Scarola's firm filed a charging lien in the Scheller lawsuit in which it claimed that the discharge occurred after full performance by the firm and that it was therefore entitled under the 1982 agreement to 40% of the $15.5 million recovery; alternatively it sought quantum meruit. Scheller responded with a pleading that the firm had been discharged with cause before the recovery and that any fee due under quantum meruit would be exceeded by the damages caused by Scarola's conduct.
The trial judge concluded that Scarola's conduct constituted: (a) an attempt to force his client to give up his position that the 1987 fee agreement controlled; (b) an attempt to pressure his client, at a time of great disadvantage for the client, into signing a new fee agreement with more favorable terms to the lawyer; and (c) an abandonment of the client at a critical stage, without adequate protection for the client's interests.[4] He then concluded that this conduct amounted to a material *950 breach of the entire contract of representation. The remedy, according to the trial judge, was a forfeiture of any fee due, even though Scheller had explicitly made clear that he was not seeking a forfeiture.
We, of course, give great deference to the trial judge's factual findings, especially when they are supported as here by competent substantial evidence. We are not bound, however, to accept a trial court's legal conclusions. Indeed, the search for the rule of decision to be applied to factual findings is our primary role. In this hotly contested, post-judgment proceeding, we have great sympathy for the position of the trial judge and admire his great patience, fair and dispassionate consideration, attention to detail and nuance, and his thoughtfully crafted findings of fact and legal conclusions. It is only after great deliberation that we disagree with his conclusion as to the remedy.
In Rosenberg v. Levin, 409 So.2d 1016 (Fla. 1982), the supreme court held that an attorney representing a client under a contingency fee agreement, who is discharged without cause by the client before any recovery, is entitled to a fee based on quantum meruit but not to exceed the maximum fee provided in the fee agreement. The court did not say, and Rosenberg did not involve, what fee would be due when the lawyer was discharged with cause. This case directly presents that issue.
We begin our analysis by distinguishing the circumstance where no valid fee agreement ever came into being because of misconduct by an attorney in procuring the agreement for representation. See e.g., Jackson v. Griffith, 421 So.2d 677 (Fla. 4th DCA 1982) (attorney not entitled to fee under quantum meruit where fee agreement procured by coercion, duress and threats); Spence, Payne, Masington & Grossman P.A. v. Philip M. Gerson P.A., 483 So.2d 775 (Fla. 3d DCA), rev. denied, 492 So.2d 1334 (Fla. 1986) (attorney whose fee contract is void for violation of § 877.02(1) is not entitled to quantum meruit fee). These cases do not stand for a forfeiture of fees so much as they reject the idea that an attorney who violates statutes or rules of discipline in procuring contracts for fees can validly earn any fee. That is not the situation here.
In Rosenberg, the court was mainly concerned with fashioning a rule to govern fees for lawyers who have done nothing wrong but who nonetheless have been discharged by the client before the contingency fee could be wholly earned. The court concluded that it was necessary to adopt a rule that would do the least possible violence to the principle that clients should be freely able to terminate the attorney's representation at any time, while also ensuring that lawyers are reasonably able to be fairly compensated for their services when so discharged, i.e., without cause or breach on their part.
The rule thus adopted was that the attorney discharged without cause before the contingency had occurred is entitled to a fee under quantum meruit but not to exceed the amount provided in the discharged attorney's fee contract. In essence, Scarola's position[5] is that he should get the same fee  quantum meruit not exceeding his fee agreement  even though he was discharged with cause, i.e. for breaching his contract of representation. We are unable to agree that he can be found to have breached his contract of representation and, at the same time, expect to receive the same fee that a nonbreaching lawyer could get.
Neither can we agree with Scheller that the lawyer discharged with cause must necessarily be entitled to no fee of any kind, or that any quantum meruit fee must necessarily and inevitably be forfeited, simply because Scarola was guilty of a breach. Where the attorney has performed substantial services on a valid contract of representation before his breach, it cannot be said that the agreement was void from the very beginning. Nor could it reasonably be said in this circumstance that the forfeiture of even a quantum meruit fee is necessary, e.g., simply to prevent the attorney from profiting from violating a penal statute in procuring the contract, as was the case in Spence Payne; or to *951 prevent a lawyer from gaining any profit from a fee contract forced on an unwilling client through coercion, duress and threats, as in Jackson.
We agree with the trial judge that the attorney client relationship is contractual, even if heavily infused with public policy considerations. Recognizing the public policy constraints that govern attorney fee agreements is not the same thing, however, as concluding that only special rules will be used to decide disputes when an attorney breaches his contract of representation with his client. The unadorned legal conclusion that attorneys' fee agreements are greatly affected by public policy considerations, lacking in most other contractual arrangements, does not mean ipso facto that the ordinary legal remedies are insufficient to protect clients from breaching lawyers. Public policy concerns should supplant legal remedies only if such remedies are inadequate to their purpose and insufficient to protect the client's unfettered right to end the services of a breaching lawyer.
We thus turn to legal remedies. The general contract rule, or remedy, is as follows:
"Subject to the rule stated in Subsection (2) [liquidated damages provision in parties' contract], if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach."
RESTATEMENT (SECOND) OF CONTRACTS, § 374(1) (1979). That rule has long been the law of Florida. See Tunno & Jessup & Co. v. Robert, 16 Fla. 738 (1878) ("Where a party has agreed to do certain work * * * and he fails to perform his agreement, yet if the work done and material furnished are of value and are accepted by the other party, he is entitled to recover a quantum meruit for his work and a quantum valebant for his materials. The owner, however, should be held to pay in damages only so much as will make the sum agreed to be paid good, deducting the loss or damage occasioned by the variation from the contract"); see also Booske v. Gulf Ice Co., 24 Fla. 550, 5 So. 247 (1888); Stephens Lumber Co. v. Cates, 62 Fla. 382, 56 So. 298 (1911); and Boyce Const. Corp. v. District Bd. of Trustees of Valencia Community College, 414 So.2d 634 (Fla. 5th DCA 1982).
The general rule in agency law is somewhat different:
"If a principal properly discharges an agent for breach of contract, or the agent wrongfully renounces the employment, the principal is subject to liability to pay to the agent, with a deduction for the loss caused the principal by the breach of contract:
(a) the agreed compensation for services properly rendered for which the compensation is apportioned in the contract, whether or not the agent's breach is willful and deliberate; and
(b) the value, not exceeding the agreed ratable compensation, of services properly rendered for which the compensation is not apportioned if, but only if, the agent's breach is not willful and deliberate."
RESTATEMENT (SECOND) OF AGENCY, § 456 (1957). Scheller correctly points out that this provision is unlike the functionally similar provision in the Restatement of Contracts, because it expressly allows for an entire forfeiture of the agent's compensation where his breach is "willful and deliberate."[6] Indeed, as he also stresses, another provision in the same Restatement squarely denies all compensation to an agent who engages in conduct that "is disobedient or which is a breach of his duty of loyalty" and is (again) "willful and deliberate." See Id. at § 469 (1957). These agency variations from ordinary contract law are properly viewed as "special" rules for fiduciaries, which an attorney surely is.
There is now even a more directly pertinent compilation of the law relating to lawyers, the RESTATEMENT OF THE LAW GOVERNING LAWYERS (Tentative Draft No. 4 April *952 1991) [R/LGL]. Section 49 thereof states the following rule:
"A lawyer engaging in clear serious violation of duty to a client may forfeit some or all of the lawyer's compensation for the matter. In determining whether and to what extent forfeiture is appropriate, relevant considerations include the extent of the violation, its willfulness, any threatened or actual harm to the client, and the adequacy of other remedies."
The commentary for this provision makes clear that forfeiture is not to be woodenly applied, and not even for all serious violations by the lawyer:
"Forfeiture of fees, however, is not justified in each instance in which a lawyer violates a legal duty. Some violations are inadvertent or do not significantly harm the client. Some can be adequately dealt with by the remedies described in Comment a or by a partial forfeiture (see Comment e). Denying the lawyer all compensation would sometimes be an excessive sanction, giving a windfall to a client who would benefit from the lawyer's services without having to pay for them. The harshness of an uncompromising forfeiture rule, moreover, could lead to its being unenforced. The remedy of this Section should hence be applied with discretion."
R/LGL § 49 (Comment b) (Tentative Draft No. 4, April 1991).[7] To guide the exercise of that discretion, the drafters included the following comment:
"In approaching the ultimate issue of whether violation of duty warrants fee forfeiture, several factors are relevant. The extent of the misconduct is one factor. Normally, forfeiture is more appropriate for repeated or continuing violations than for a single incident of otherwise comparable misconduct.

"Whether the breach involved knowing violation or conscious disloyalty to a client is also relevant. See Restatement, Second, Agency § 469 (forfeiture for willful and deliberate breach). Forfeiture is generally inappropriate when the lawyer has done nothing willfully blameworthy, for example, when a conflict of interest arises during a representation because of the unexpected act of a client or third person.
"Forfeiture is ordinarily inappropriate when a lawyer's acts, although in breach of duty to the client, cause no harm to the client. For example, a lawyer's failure to keep a client's funds segregated in a separate account (see § 56) should not result in forfeiture if the funds are preserved undiminished for the client. But forfeiture may be justified even though no harm was suffered or the harm was of little consequence. One of the justifications for forfeiture is that it is sometimes difficult to ascertain the harm a lawyer's misconduct may have caused. The harm may be intangible, such as the client's loss of trust in the lawyer's loyalty and good faith.
"The adequacy of other remedies is also relevant. If, for example, a lawyer fails to send a client bills in breach of contract, and is consequently limited to a quantum meruit recovery significantly smaller than the fee contract provided, it may be unnecessary to forfeit the quantum meruit recovery as well." [e.s.]
Id. at Comment d. Another Comment makes clear that the timing, or place, of the lawyer's misconduct in the sequence of things, as well as the resulting effects on the client, may be of importance:
"Sometimes, moreover, forfeiture for the entire matter is inappropriate, for example when a lawyer performed valuable services before the misconduct began, and the misconduct was not so grave as to require forfeiture of the fee for all services. Ultimately the question is one of fairness: considering the special duties imposed on lawyers *953 the gravity and likely consequences to the client of the lawyer's misbehavior, and any connection between the various services performed by the lawyer, to what extent does the lawyer's misconduct deprive the lawyer of any just claim to be paid? The factors relevant to determining whether forfeiture should occur also bear on the appropriate extent of the forfeiture. See Comment d hereto." [e.s.]
Id. at Comment e.
We distill from these explanatory notes that fee forfeiture is not an automatic remedy, even for serious transgressions. Forfeiture of all fees is the final remedy, one to be hesitatingly applied only when no other remedy will fairly vindicate the unique standards of conduct to which lawyers have sworn fealty. While a court should not shrink in a proper case from denying all compensation to an offending lawyer, it should do so only after exhausting the aptness of all other remedies to cure the specific act of misconduct in issue.
Moreover, we are also troubled by the fact that, while Scheller expressly conceded in the trial court that he did not seek any forfeiture, on appeal he vigorously argues for the very remedy that he conceded away.[8] In this court, Scarola heatedly contends that Scheller should be held to have waived fee forfeiture.[9] Even if, however (at least where attorney's fees are concerned), a trial judge is not rigidly bound by a party's apparent concessions in the heat of closing argument in a fee dispute, nevertheless the fact that Scheller disclaimed forfeiture should weigh heavily in assessing the adequacy of legal remedies. An extraordinary remedy like fee forfeiture should be considered only when an ordinary remedy like offsetting damages is plainly inadequate.
In rejecting a mechanical application of fee forfeitures, we should not be misunderstood as countenancing misconduct by lawyers. It should require no belaboring that attorneys are not permitted to hide behind the ordinary laws of the marketplace, but instead are held to "the punctilio of an honor the most sensitive."[10] In acknowledging that high standard, however, we must not confuse our role on this appeal with that of the lawyer disciplinary process, which belongs in another forum. Rather our present role is to ask whether the ordinary legal remedies will fairly do in upholding the high standards governing lawyers.
Here we conclude that the trial judge erred  not by abusing his discretion  but by not considering and thus rejecting the application of ordinary legal remedies.[11] The breach in this case occurred after this trial *954 lawyer's essential duties were near an end. He had already been successful in obtaining a jury verdict far greater than one might reasonably have imagined when he began. That verdict had withstood an appeal. The lawyer's services were thus substantial by any measure. Moreover, the benefits conferred on the client were equally substantial: a judgment now worth more than $26 million had survived appellate review, and a serious offer to settle the judgment for just under $20 million was on the table. By going directly to fee forfeiture without applying other remedies first, however, the trial court concentrated his remedial powers on punishing the offending lawyer  which, though undeniably necessary and important, was not the function of the trial court here. Punishment, if it should come at all, lies instead with the Bar disciplinary process.
If the court had first applied legal remedies, it would have addressed the issue of damages suffered by the client as a result of the lawyer's breach. Thus, if he had done so and reduced a quantum meruit fee by the amount of the client's damages, the court might have concluded that any fee thus reduced would have adequately compensated the client for the attorney's breach. And even if the court should then reach the issue of forfeiture, it would have done so only after determining whether the client would thereby receive an undue windfall from a total fee forfeiture.
On remand, the court should view this case from its posture at the time of breach. At that point there was a substantial recovery all but in hand after many years of uncompensated service by the breaching lawyer. From that perspective, a trial judge's reasonable exercise of discretion could lead to the conclusion that the ordinary restitutionary remedies of contract and agency law would be enough to ameliorate the lawyer's breach in a way that does not burden the client's right to discharge his breaching lawyer, without resulting in a great windfall to the client.
In addressing whether to reduce the quantum meruit fee by the damages suffered by Scheller as a result of Scarola's breach, it is conceivable on this record that the court might find from the evidence that his damages are equal to the difference between what he would have settled at in early February if Scarola had placed aside his own interests to concentrate on effecting the settlement his client had directed, and what he actually settled at much later.[12] For example, if the court's finding should turn out to be that the $19.9 million settlement could have been accomplished, then by one view of the evidence those damages could be as much as $4.4 million. A $4.4 million offset against fees is not to be lightly regarded. Certainly no one has advanced any reason why such a remedy is facially insufficient to vindicate the high standards governing lawyers.
We are unable from this record and the trial judge's existing findings and conclusions to apply this analysis in the first instance ourselves. Was any quantum meruit recovery limited by the 40% provided in the 1982 agreement, or instead by the 40-30-20% provided in the 1987 agreement?[13] Once the question which contract governs has been answered, the court must also make a finding as to what the quantum meruit fee, unreduced by any client's damages, would otherwise be. Nor is there any finding as to what damages Scheller suffered from Scarola's breach.[14] Consequently, it is necessary that *955 we remand this case to the trial judge for appropriate findings on these issues.
If the client's damages exceed the quantum meruit fee, then that should end the matter. The fee would not then be forfeited but rather offset against the attorney's obligation to the client.[15] If, however, the client's damages do not exceed a quantum meruit fee, the court is then free to consider whether forfeiture of some or all of the quantum meruit fee as already reduced by the client's damages is appropriate under these circumstances. In reaching that conclusion the court should exercise its discretion in light of the relevant considerations discussed in the Restatement of the Law Governing Lawyers, as well as any other factors the court deems relevant.
REVERSED AND REMANDED WITH DIRECTIONS.
STONE and WARNER, JJ., concur.
NOTES
[1] See also Scheller v. American Medical Intern., 502 So.2d 1268 (Fla. 4th DCA), rev. denied, 513 So.2d 1060 (Fla. 1987); Scheller v. American Medical Intern. Inc., 583 So.2d 1047 (Fla. 4th DCA 1991), rev. denied, 598 So.2d 78 (Fla. 1992); and American Medical Intern. Inc. v. Scheller, 462 So.2d 1 (Fla. 4th DCA 1984), rev. denied, 471 So.2d 44 (Fla. 1985), cert. denied, 474 U.S. 947, 106 S.Ct. 345, 88 L.Ed.2d 292 (1985).
[2] See R. Regulating Fla.Bar 4-1.5(f)(4)(B)(i).
[3] He included the appellate portion of the fee, as well as the trial portion. Actually his firm had engaged outside counsel to handle the appeal. There was no contest below as to that 5% portion of the fee being paid directly to that appellate counsel. Consequently, the real dispute centers only on the portion of the fees due the trial lawyer.
[4] The trial judge quoted the following in his conclusions: "`An attorney's threat to withdraw from representation of the client unless an additional fee is paid is considered strong evidence of the extortion paradigm at work.' Anderson & Steele, Ethics and the Law of Contract Juxtaposed: A Jaundiced View of Professional Responsibility Considerations in the Attorney-Client Relationship, Geo.J.Legal Ethics 811 (1991)." He later explained:

"The claim in this case that the Code of Professional Responsibility somehow justified an eleventh-hour demand that the client execute a [new] written contract * * * is pure sophistry. It masked greed, overreaching and attempted extortion."
[5] On appeal, Scarola has apparently abandoned his contention that he is entitled to a fee under the contract, i.e. a fixed percentage of the amount recovered. He argues only for quantum meruit.
[6] A comment to section 456 explains that the term "willful and deliberate" refers to conduct that, among other illustrations, is disloyal or grossly insubordinate.
[7] See also R/LGL § 52 (Tentative Draft No. 4, April 1991), which says in part:

"When the client-lawyer relationship ends before the lawyer has completed the services due for a matter:
(1) A lawyer who has been discharged without forfeiting the lawyer's fee under § 49 and after substantially performing the services due, or any severable part of them, may recover the compensation provided by any otherwise enforceable agreement, less the value of the services covered by that contractual compensation that the lawyer did not provide because of the discharge * * *." [e.s.]
[8] When pressed by the trial judge, Scheller's lawyer made clear that he had considerable discomfort with the whole idea of fee forfeiture and that he was not specifically seeking that remedy. Instead, he argued that his damages exceeded any reasonable quantum meruit fee. The trial judge's written conclusions make no mention of, and do not address, that concession.
[9] Scheller trumps that waiver argument with one of his own. He points to a similar concession by Scarola's counsel, also during closing argument when pressed by the trial judge, to the apparent effect that if the court found Scarola guilty of any breach, then he would be entitled to no fee. To read the several pages of transcript as Scheller contends on appeal would be to conclude that Scarola's trial counsel in this fee dispute conceded away his entitlement to any fee. We do not think that this concession can fairly be so read. It appears to us, instead, to be a recognition that, if the court found Scarola guilty of the kind of conduct found in our Jackson decision or the Third District's in Spence Payne, then he would be entitled to no fee of any kind. Here, again, the court makes no mention of this concession in its opinion, indicating to us that the court did not base its decision on it. Neither do we.
[10] forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."
Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).
[11] This error resulted from the court's decision early on to bifurcate the proceeding: first, the court planned to address the issue actually decided, and only after a decision not to forfeit any fee would the court have taken up the amount of any quantum meruit fee. As this opinion makes clear, the court should have done it in reverse order; the quantum meruit fee should have been first determined, then the issue of any setoff for the client's damages from the attorney's breach, and only last whether some or all of any resulting fee should be forfeited.
[12] The court found that during the critical time, when AMI renewed its offer of $19.9 million, Scheller responded that $19.9 million "was too little and too late." Scheller then raised his demand to $22.5 million. After discharging Scarola and his firm, Scheller's new lawyer was able to get AMI to offer a cash settlement of $21 million, but time ran out before the other details of an agreement could be negotiated and a final settlement consummated. Thus, the present findings are insufficient to a decision on precisely where the case could have been settled if Scarola had not acted as he did. On remand, the court will want to make that finding.
[13] A subsidiary question of the issue as to which fee agreement governs is whether the 1987 agreement was the result of a mutual mistake of fact and, in which case, whether it should be rescinded.
[14] Contrary to the assertion in the Restatement of Law Governing Lawyers, this case may well be one in which the court can quantify actual damages suffered by the client from the attorney's breach.
[15] We see a considerable difference between offsetting one debt with another, on the one hand, and a forfeiture of an entitlement to a fee, on the other. While the net monetary result in a given case may be indistinguishable, that is merely fortuitous. The legal theories are worlds apart.