784 So.2d 500 (2001)
ST. JOHNS RIVER WATER MANAGEMENT DISTRICT, Appellant/Cross-Appellee,
v.
FERNBERG GEOLOGICAL SERVICES, INC., Appellee/Cross-Appellant.
No. 5D00-1100.
District Court of Appeal of Florida, Fifth District.
April 12, 2001.
Rehearing Denied May 5, 2001.
*502 William H. Congdon, Palatka, for Appellant/Cross-Appellee.
Daniel J. Webster of Daniel J. Webster, P.A., Daytona Beach, for Appellee/Cross-Appellant.
SAWAYA, J.
St. Johns River Water Management District [St. Johns] appeals the final judgment in favor of Fernberg Geological Services, Inc. [FGS] in the suit filed by FGS alleging St. Johns had tortiously interfered with FGS's business relationship with the Volusia City County Water Supply Co-op [Co-op]. St. Johns argues that its motions for directed verdict should have been granted because there was no competent substantial evidence to establish the essential element of causation or that the relationship between FGS and the Co-op would in all probability have continued had St. Johns not interfered. We agree and reverse.[1]
The Co-op was composed of Volusia County and the cities of Ormond Beach, Holly Hill, Daytona Beach, Port Orange, New Smyrna Beach, and Edgewater.[2] Historically, each city had individually obtained its consumptive use permit [CUP] from St. Johns. The CUP process can take several years and cost up to several hundred thousand dollars. Because of the proximity of the cities, the cities' monitoring wells were duplicative. In 1993, the members of the Co-op became interested in consolidating their individual efforts and obtaining a single CUP covering their collective area. This would represent a substantial savings to the member cities and would alleviate the concerns voiced by the owner of the land on which a number of the monitoring wells were located. The *503 Co-op hired FGS to develop what they labeled a "Consumptive Use Permit Compliance Program." It was agreed that the cities of Ormond Beach, Holly Hill, and Daytona Beach would be the "test" group.
The contract between the Co-op and FGS contemplated four phases, each to be "fleshed out" and funded separately. Funding of each phase was required to be by unanimous vote of each city. FGS completed and was paid for Phase I. FGS anticipated continuing under the contract to perform the next three phases of the contract; however, problems arose in early 1995. The phases were contingent on funding by each city and Ormond Beach and Daytona Beach had not committed to funding any phases past Phase I. Ormond Beach thought the FGS contract was too expensive and Daytona Beach had its own consultant and had thus postponed any decision until October of 1995. In the spring of 1995, neither city had agreed to proceed with the additional phases of the contract. The Co-op came up with the idea of requesting that $125,000 of the funds that St. Johns had budgeted to give to the Co-op be used to partially fund the contract. The Co-op never asked St. Johns to step in and prepare the program; the Co-op asked only that St. Johns provide the money to pay FGS to develop the program.
In February 1995, Richard Fernberg, the geologist behind FGS, met with St. Johns to give a summary of the compliance plan, present FGS's report on Phase I, and summarize FGS's proposed efforts under Phases II and III. He described St. Johns as being "very receptive" to his ideas. The Co-op made a request for funding by St. Johns, seeking permission to use the $125,000 to pay FGS to develop the program. Initially, St. Johns agreed to support the pilot program. However, in March, the Co-op received a letter stating that St. Johns was considering development of a wellfield monitoring plan "in house." St. Johns's proposal encompassed only a portion of the work proposed by the multi-phase contract. St. Johns knew that FGS had a business relationship with the Co-op when St. Johns made its offer. It believed, however, that the FGS contract had not been funded by the Co-op's member cities and was "dead."
In March 1995, Barbara Vergara, Director of the Division of Water Supply with St. Johns, spoke at a Co-op meeting and explained that St. Johns wanted the opportunity to develop a cooperative compliance program "in house" so as to better understand the challenge of creating a single plan and gain the ability to apply the knowledge to others. St. Johns would develop the wellfield monitoring program at no cost to the Co-op. Richard Fernberg objected at the meeting, asserting that FGS already had a contract with the Coop. The Co-op voted to accept St. Johns's offer and had no further relationship with FGS. The director of the Co-op, Mr. Feastor, testified that the Co-op would have continued using FGS if St. Johns had not offered its services for free, with the caveat that it would have done so as long as money was available to perform under the contract.
Mr. Fernberg wrote to St. Johns and strenuously objected to St. Johns's act of taking work away from FGS. Henry Dean, Executive Director of St. Johns, responded with an indignant letter stating that Mr. Fernberg's allegations were "inaccurate and highly misleading." Mr. Fernberg spent two months trying to get the project back from St. Johns. At one point, St. Johns offered FGS $20,000 to act as a consultant on the project in order to settle the dispute. FGS rejected the offer and filed the instant suit alleging that St. Johns had interfered with its advantageous *504 business relationship.[3] The court denied St. Johns's motion for a directed verdict on the claim. The jury found in favor of FGS and awarded it $603,633, which amount was reduced by a remittitur order to $549,080. As explained seriatim, we conclude that the motion for directed verdict should have been granted and thus reverse for entry of judgment in favor of St. Johns.
"A motion for directed verdict should be granted when there is no reasonable evidence upon which a jury could legally predicate a verdict in favor of the nonmoving party." Cecile Resort, Ltd. v. Hokanson, 729 So.2d 446, 447 (Fla. 5th DCA 1999). An appellate court, in reviewing a trial court's order on a motion for directed verdict, "is required to evaluate the testimony in the light most favorable to the plaintiff and every reasonable inference deduced from the evidence must be indulged in the plaintiff's favor." Id. (citing American Motors Corp. v. Ellis, 403 So.2d 459, 467 (Fla. 5th DCA 1981), review denied, 415 So.2d 1359 (Fla.1982)). Having reviewed this case with this standard firmly in mind, we conclude that FGS simply failed to prove the elements of its cause of action.
The elements of a cause of action based on tortious interference with a business relationship are (1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812 (Fla.1994) (citing Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla.1985)).
A protected business relationship need not be evidenced by an enforceable contract. Id. However, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." Register v. Pierce, 530 So.2d 990, 993 (Fla. 1st DCA), review denied, 537 So.2d 569 (Fla.1988). The court in Ethan Allen further stated that "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." 647 So.2d at 815.
As with most other torts, embedded within the essential elements of the tort of intentional interference with a business relationship is the legal requirement that the plaintiff prove causation. In Gossard v. Adia Services, Inc., 723 So.2d 182 (Fla.1998), a cause of action based on intentional interference with a contract, the court found Ethan Allen, a decision based on the tort of intentional interference with a business relationship, controlling and enunciated the standard of causation that now apparently applies to both causes of action. Although the judicial trend[4] seems to increasingly meld the two torts *505 into one by blurring the lines of demarcation that were once clearly drawn between them, the court in Gossard did say that Ethan Allen is consistent with section 766 of the Restatement (Second) of Torts and comment h, from which the causation standard is adopted. Therefore, we will apply Gossard to the instant action.
Pursuant to Gossard, causation is established when one intentionally and improperly interferes with a business relationship between two other parties by "inducing or otherwise causing" one party to breach or sever the business relationship. Gossard, 723 So.2d at 184 (quoting from the Restatement (Second) of Torts, § 766 (1979)). "Induce" means to cause one party "to choose one course of conduct rather than another." Id. at 185 n. 1 (quoting Restatement (Second) of Torts, § 766, comment h (1979)). The inducement may be by persuasion or intimidation so long as the party induced is free to choose one course over another if he or she is willing to suffer the consequences. Id. The term "otherwise causing" refers to the situation where the party is left no choice because he or she is rendered incapable of carrying on the business relationship. Id. Thus in order to establish causation, there must be a business relationship in existence. Having articulated the legal principles established in the leading cases of Ethan Allen and Gossard, we now undertake to apply them to the facts of the instant case.
To prove its case, FGS was required to put on evidence that, in all probability, it would have been hired to perform the additional phases of the contract with the Co-op but for the interference by St. Johns. FGS did not make this requisite prima facie showing. The evidence reflected only that FGS wanted, and indeed hoped, to perform the additional phases of the contract, but that the contract could not go forward unless and until Ormond Beach and Daytona Beach joined Holly Hill in funding it. At the time St. Johns made its offer to perform a portion of the work called for by the multi-phase contract, Ormond Beach representatives were recommending against funding and Daytona Beach had decided to postpone the decision on funding until the fall. As St. Johns asserts, St. Johns could not have intended to induce or otherwise cause the Co-op to reject the FGS contract because, as the undisputed evidence showed, FGS had only a speculative hope that the Co-op would eventually fund the contract. The speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship. Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc., 459 So.2d 335 (Fla. 5th DCA 1984) (holding that plaintiff's claim for loss of future business was too speculative to support the damage award).
FGS argues that the fact that Daytona Beach had decided to postpone its decision on funding until October of 1995 did not eradicate the project. It reasons that Daytona Beach would have ultimately chosen to fund the FGS contract because FGS's contract was cost effective. However, suppositions of what Daytona Beach would or would not have done are not relevant to the claim of interference with the business relationship. While the tort does not require that there be an enforceable contract in place, it does require that there have been "existing or prospective legal or contractual rights." Ethan Allen, 647 So.2d at 814 (quoting Register, 530 So.2d at 993). The test is whether there was "an understanding between the parties [which] would have been completed had the defendant not interfered." Id. (citations omitted). Under that test, St. Johns was entitled to a directed verdict as there was a complete absence of competent substantial evidence that the multi-phase *506 contract would have gone forward had St. Johns not made its offer. FGS cannot establish that St. Johns induced or otherwise caused the Co-op to sever or breach a business relationship because the requisite relationship did not exist. Accordingly, we reverse.
REVERSED.
THOMPSON, C.J., and HARRIS, J., concur.
NOTES
[1] Our resolution of this issue renders moot the additional arguments advanced by St. Johns. We find no merit in the issues raised by FGS's cross appeal.
[2] The Co-op dissolved in 1996 and the interests of its members are now represented by a group called the Volusian Water Alliance.
[3] In June 1995, Mr. Dean wrote the Co-op that St. Johns was withdrawing its offer to assist the Co-op in developing a wellfield monitoring plan. St. Johns did nothing further to develop a prototype plan. The Co-op morphed into the Volusian Water Alliance in 1996 and, as of early 2000, had done nothing further to develop the consolidated plan begun by FGS.
[4] See, e.g., Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So.2d 381 (Fla. 4th DCA 1999); Smith v. Ocean State Bank, 335 So.2d 641 (Fla. 1st DCA 1976) ("[t]ortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship.").