824 So.2d 935 (2002)
CENTRAL STATES, SOUTHEAST & SOUTHWEST, etc., Appellants,
v.
FLORIDA SOCIETY OF PATHOLOGISTS, etc., et al, Appellees.
No. 5D01-501.
District Court of Appeal of Florida, Fifth District.
July 12, 2002.
Rehearing Denied September 4, 2002.
Denis L. Durkin and Robert W. Thielhelm, Jr. of Baker & Hostetler, L.L.P., Orlando, for Appellants.
David L. Evans and David C. Willis of Mateer & Harbert, P.A., Orlando, and Jack R. Bierig, Richard D. Raskin and Scott D. Stein of Sidley, Austin, Brown & Wood, P.A., Chicago, for Appellees.
*936 THOMPSON, C.J.
Central States, Southeast and Southwest Areas Health and Welfare Fund ("Central States") appeals a summary judgment in favor of Florida Society of Pathologists, Ameripath Florida, and Ruffolo, Hooper & Associates (collectively "the pathologists"). Central States is a multi-employer/employee health and welfare plan with its principal place of business in Chicago and has members who reside in Orange County and elsewhere in Florida. Fasig v. Florida Society of Pathologists, 769 So.2d 1151 (Fla. 5th DCA 2000).[1] Florida Society of Pathologists is the largest professional organization of pathologists in Florida, and Ameripath and Ruffolo Hooper are pathology practices whose pathologists provide laboratory services for patients throughout the state. Id. The pathologists sued Central States, seeking injunctive relief and damages for unfair trade practices and interference with business relationships, after Central States communicated to many of its members that it did not think the pathologists appropriately billed the members for services. We reverse.
Through brochures, the pathologists informed hospital patients of the following:
It you receive two statements for your laboratory work, one will be from the pathologist and the other from the hospital or facility where the work was performed. The pathologist's bill will cover his or her professional services in examining and analyzing your blood, cells, tissue, or other specimens, reporting the findings, and consulting with your physician when it is appropriate. The bill from the hospital or other facility represents the cost of furnishing and equipping the laboratory and providing pathology services.
Actually, hospital patients who had pathology services received a bill from the hospital, along with one from the pathologist associated with the hospital, even if the pathologist never "examin[ed] or analyz[ed] [the patient's] blood, cells, tissue, or other specimens," and even if the pathologist never reviewed the results of the testing, which is done for the most part by machine and technician. See id.
Notwithstanding the claim of patient-specific, direct services made in the pathologists' publications, the pathologists claim in the instant case that they are entitled to bill patients for a non-patient-specific "professional component" of pathology services. Professional component charges are fees for testing specimens drawn from patients, although the specimens are not drawn by pathologists and are tested by machines, rather than pathologists. Id. According to the pathologists, clinical pathology is not limited to the direct, hands-on review of particular test results, but involves deciding whether to offer, modify, or discontinue a clinical test, evaluating or designing protocols for new procedures, evaluating the normal range of test results in light of the specific patient population, overseeing calibration of the equipment, and teaching treating physicians how to evaluate the test results. Pathologists must be available 24 hours a day and seven days a week to address questions about specific results for specific patients, and may need to consult with the treating physician or research an unusual case. They must review results that deviate from the norm and determine whether the deviation is attributable to the patient or to error. "Collectively," the pathologists state in their brief, "the services of pathologists in directing the medical laboratory to assure the timeliness, reliability, and usefulness of *937 test results for specific patients are known as the `professional component' of clinical pathology."
Central States pays the hospitals' pathology charges, but contended successfully in federal court that its plan does not cover bills for the professional component because its plan covers "treatment," and the "hands-off" aspects of the professional componenti.e. calibrating the machines and the likedoes not constitute treatment. Moreover, Central States told its members that they should not pay any bills they might receive for the professional component. The position of Central States was that it had paid all a member owed when it paid the hospitals' pathology charges. If the pathologists had submitted any bills for professional services specifically directed at a particular member, such as blood analysis or consultation with the treating physician, it would have paid the bills. Central States thinks that if the pathologists want to be paid for the professional component, they should seek payment from the hospitals at which they perform their oversight of the laboratory.
Central States sent letters to the pathologists setting forth its position. It sent copies of these letters to its members, and the pathologists allege that the letters contain false statements and material omissions, and constitute unfair and deceptive trade practices. The pathologists further contend that this "letter campaign" has tortiously interfered with the pathologists' business relationships with members of Central States. The letters state that Central States paid the hospitals for the laboratory services, but denied payment for the pathologists' professional component in the absence of evidence that the pathologist performed a specific, identifiable service for the individual patient who was charged for the professional component.
The letters further state:
Furthermore, if you prosecute Central States' participants to collect "professional component" charges not supported by the provision of patient-specific services, Central States will ensure that its participants are represented by able counselat Central States' expense. The United States District Court for the Northern District of Illinois has found that because the pathologist has not performed a patient-specific service, "the charge for the professional component is therefore unreasonable...." Although the U.S. Court of Appeals for the Seventh Circuit held ... that Central States is not entitled to a refund for professional component charges it has paid in the past, the Court of Appeals did not disturb the trial court's ruling that the professional component charge should not be covered by Central States and is unreasonable.
The federal cases to which the letters refer are Central States v. Pathology Laboratories of Arkansas, P.A., 1994 WL 362187 (N.D.Ill.1994), and Central States v. Pathology Laboratories of Arkansas, P.A., 71 F.3d 1251 (7th Cir.1995) (hereafter Central States). The letters do not mention the seventh circuit's statement that the patients in that case had "contractual commitments" to pay the professional component fees, commitments which were unaffected by the fact that the plan did not cover professional components. Central States, 71 F.3d at 1253. However, the position of Central States is that the patients in the instant case have no contractual obligation to pay these bills.
The pathologists' second amended complaint, with which Central States has a *938 procedural problem,[2] is slightly more specific in stating that Central States made these statements in writing and orally, and that "on information and belief," Central States told its members that professional component charges were double-billing, improper, and fraudulent. This complaint states that Central States mischaracterized the nature of pathology services, and that pathologists provide direct benefits to patients even if they do not review a particular test result. Further, this complaint alleges that Central States falsely suggested that patients should have to pay only for clinical test results that a pathologist actually reviews.
In its lengthy declaratory judgment order,[3] the court below ruled that Central States had engaged in unfair and deceptive trade practices and had tortiously interfered with the pathologists' business relationships with the patients for whom they have provided professional component services. The court ruled, based on the seventh circuit opinion in Central States, and American Medical International, Inc. v. Scheller, 590 So.2d 947 (Fla. 4th DCA 1991), that Central States had misled its members by telling them that professional component charges do not reflect a service to the patient, that the charges for these services were unreasonable, and that the members were not obliged to pay them. It further ruled that Central States had falsely told its members that pathologists had no legal right to collect payment from them. The court ruled that the description given by Central States of Central States "cannot be considered a legitimate interpretation of the outcome of that case."
The court enjoined Central States from communicating to its members that: (1) professional component billing is fraudulent, improper, or unreasonable; (2) Central States supports the position that such billing is unreasonable; (3) professional component billing is double billing, unless Central States can establish that the pathologist has already been paid by some other source for the same charges for which the pathologist is billing the patient; and (4) Central States has already paid the hospital for the professional component, unless Central States can establish that its payments include payment specifically designated for the professional component and that the hospital passed the payment through to the pathologist.
As to the count for tortious interference, the court ruled that the pathologists had valid business relationships with patients for whom they provided professional component services. The court cited Central States for the point that all patients who receive pathology services benefit from the professional component, and noted that a favorable verdict for the plaintiff pathologist was sustained on appeal in Scheller.
In Scheller, the dispute was between a hospital, which had a director of pathology, and another pathologist, Dr. Scheller, who was at that time not connected to the hospital. As was their right, some individual doctors designated Dr. Scheller their expert pathologist, which meant that Dr. Scheller was entitled to the use of the hospital facilities. According to Scheller, because the hospital paid its director of pathology a salary for running *939 the laboratory, he could not charge patients a fee for the professional component. However, the hospital could and did charge for the professional component. The patients whose physicians designated Dr. Scheller their expert were billed by the hospital for the professional component, but these patients were double-billed, because Dr. Scheller was also charging them for the professional component. As a result of the double billing, doctors felt compelled to revoke their designations of Dr. Scheller, resulting in a loss of income to him.
According to the court, Dr. Scheller's billing method was in accord with the established billing practice of pathologists in Florida and the majority of other states, and his bills were approved by Medicare and private insurers. Although it was the director of pathology rather than Dr. Scheller who oversaw the laboratory, Dr. Scheller prevailed with respect to his claim of entitlement to bill for the professional component; in Scheller, however, the professional component is described merely as the cost of professional services for abnormal tests spread across all tests. In the instant case, in contrast, the description of the professional component includes the latter as well as oversight of the laboratory. In any event, whatever the definition of the professional component, Scheller is distinguished from the instant case because the payors thereinsurers and Medicaredid not object to paying the professional component.[4]Scheller did not deal with the question here: whether a patient who has received no direct, "handson" services from the pathologist legally is obliged to pay a bill for the professional component.
Central States asserts that its members have no such obligation. In response, the pathologists cite en masse to admissions forms in this record, which apparently pertain to the patients whose bills are in issue here.[5] Some of the small print in these forms mentions that the patients may receive bills from pathologists, anesthesiologists and other professionals, but we see nothing in these forms that obliges a patient to pay a pathologist or anesthesiologist in the absence of a professional relationship with the pathologist or anesthesiologist. We see no mention of a professional component, and no mention of the nature of any bills the patient may receive from the pathologists. Certainly, we see nothing that obliges a patient to pay for what might be characterized as the pathologists' overhead and/or a pro rata share of hands-on pathology services performed for another patient. Cf. id.; Fasig, 769 So.2d 1151 (Harris, J. dissenting). If the pathologists know of some provision in these documents that creates a contractual relation between them and the patients, they should have cited more specifically and/or quoted the provision in their brief.
We do not credit the pathologists' argument that they have a business relationship with the members because their right to recover professional component fees is "well-established." First, institutional payors in the past did not object to this billing method. Second, the seventh circuit case, upon which the pathologists rely *940 for this point, did not hinge on a "well-established" right, but on a contractual right disclosed in that record. The pathologists have not articulated how their use of this billing method in the past creates an obligation on the part of these patients to pay the professional component, nor have they articulated any other legal theory upon which such liability could be based.
The elements of a cause of action based on tortious interference with a business relationship are: (1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship. St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc., 784 So.2d 500 (Fla. 5th DCA 2001). A protected business relationship need not be shown by an enforceable contract. Id. However, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights. Id. As a general rule, an action for tortious interference with a business relationship requires a business relationship shown by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered. Id. Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship. Id. at n. 4 (quoting Smith v. Ocean State Bank, 335 So.2d 641 (Fla. 1st DCA 1976)).
In the instant case, the court erred in ruling that Central States interfered with the pathologists' relationships with the patients because the record does not show existing or prospective legal or contractual rights on the part of the pathologists. As stated earlier, the pathologists have not cited a contract obliging the patients to pay a professional component fee. The pathologists have not shown prospective business relations with the members, because the pathologists are not in the process of offering pathology services to the members of Central States; the pathologists' claim is that the members owe them for work the pathologists have already performed.
We also conclude that the court erred in ruling that Central States was guilty of unfair and deceptive trade practices. This claim is based on the contention that Central States misrepresented the outcome of Central States. The seventh circuit did say that pathologists could bill the members of Central States for professional component services, but, as stated above, the ruling was based on a purported contractual obligation, a factor not shown to be present in the instant case. Also, because the pathologists have not shown that the patients are legally obliged to pay for the professional component, the seventh circuit's statement that pathologists provide "supervisory services of value to all patients, and interpretation services of value to some," 71 F.3d at 1253, has no bearing on the instant case. Having a good hospital pathology laboratory is also of value to the geographic community served by the hospital, but in the absence of a contract or other legal obligation, the individuals in the community do not have to pay the pathologists for the professional component. Because the pathologists have not shown that these patients have an obligation to pay a professional component fee, the lower court erred in entering judgment for the pathologists on this issue.
Reading the record in the light most favorable to the non-moving party, see Rautbord v. Industrial Avenue Realties, *941 Ltd., 356 So.2d 1289 (Fla. 3d DCA 1978), the pathologists have not shown themselves entitled to judgment on either issue, or to an injunction. Accordingly, the final summary judgment is
REVERSED.
SAWAYA and PALMER, JJ., concur.
NOTES
[1] In Fasig, a previous appeal in this case, we held that the trial court did not abuse its discretion in denying intervention by members of Central States.
[2] Central States complains that the court entered an order granting summary judgment six days after the second amended complaint was filed, and before the expiration of the discovery period, which the court had extended in consideration of its allowing the amended complaint.
[3] Central States complains that it was drafted by the pathologists and signed by the trial court with no changes.
[4] Medicare no longer considers a pathologist's oversight role a separate unit of medical care, so for Medicare patients, some hospitals charge a fee that includes pathologists' hands-off services and pay the pathologists an annual lump sum for overseeing Medicare tests. Central States, 71 F.3d at 1252.
[5] The pathologists also inform this court that the contractual commitments referred to by the seventh circuit were hospital admission forms signed by patients.