**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, et al., Plaintiffs–Appellants,**

v.

**PATHOLOGY LABORATORIES OF ARKANSAS, P.A., Defendant–Appellee.**

No. 95–2171.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1995.

Decided Dec. 1, 1995.

Thomas C. Nyhan, Robert A. Coco, James P. Condon (argued) and Bruce L. Perlin, Central States, Southeast & Southwest Area Pension Fund, Rosemont, IL, for Plaintiffs–Appellants.

Jack R. Bierig and Richard D. Raskin (argued), Sidley & Austin, Chicago, IL, for Defendant–Appellee.

Before BAUER, EASTERBROOK, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Baptist Medical Systems Hospitals of Little Rock, Arkansas, provide pathology services to their patients by contract with a group of eight pathologists, incorporated as Pathology Laboratories of Arkansas. A test of a blood or tissue specimen at one of the Hospitals leads to two charges: one from the Hospitals and one from Pathology Laboratories. The Hospitals' bill (the "technical component") covers space, equipment, and technicians' services; Pathology Laboratories' bill (the "professional component") covers setting up test protocols, calibrating the equipment and supervising the testing, and, if necessary, interpreting the results and consulting with treating physicians. Pathologists are present or on call 24 hours a day. When they intervene to ensure that a test is done right, to recheck a surprising result, or to interpret ambiguous data, they do not submit a separate bill. The professional component, a fee of $2 to $5 per test, spreads costs across all patients—and in the process it avoids the need to keep records about just which test required just which services. Medical testing is a volume business, and bookkeeping to link particular services to particular tests could augment aggregate costs.

The Medicare program does not consider pathologists' oversight role to be a separate compensable unit of medical care. See 42 U.S.C. § 1395xx(a)(1), 42 C.F.R. § 405.550. For Medicare patients the Hospitals charge a fee including the pathologists' hands-off services, such as establishing test protocols. The Hospital pays Pathology Laboratories an annual lump sum for overseeing Medicare tests. Pathology Laboratories then submits a bill under Part B of Medicare for additional, hands-on services that it can document. Most private insurers, by contrast, are happy to pay separate bills at flat rates—to remit directly to Pathology Laboratories without requiring the Hospitals to serve as an intermediary, and to cover all of the pathologists' services in a single fee. This permits payment to vary with the number of tests conducted, but without the accounting problems of trying to attach specific fees to services on specific specimens. Both the Baptist Hospitals and Pathology Laboratories submitted bills to the Central States Health and Welfare Fund, which for years paid both. In November 1991 the Fund stopped paying the professional component bills, pointing to Article 4.11 of its Plan Document, which restricts payment to the expenses of a person

who "receives treatment". The professional component fee does not signify that the patient received any treatment by a pathologist and therefore, the Fund concluded, is not compensable. In 1992 the Fund—a multiemployer welfare fund governed by the Employee Retirement and Income Security Act—filed this suit under ERISA seeking restitution of payments made to Pathology Laboratories between 1986 and 1991. The Fund also sought an injunction that would bar Pathology Laboratories from billing the patients directly for the professional component.

Pathology Laboratories filed a counterclaim, seeking a declaration that the Plan Document permits payment of professional component fees. District Judge Duff granted summary judgment to the Fund on this counterclaim. 1994 WL 362187, 1994 U.S.Dist. LEXIS 9319 (N.D.Ill.). Pathology Laboratories accepts that decision. The case then was transferred to District Judge Bucklo, who held a bench trial on the Fund's claims. Judge Bucklo concluded in an oral opinion at the close of the evidence that the Fund had been aware of the nature of professional-component bills long before November 1991. Its own medical consultant told the Fund's staff in March 1989 what professional-component bills represented. Pathology Laboratories provided the same information in 1990. A judicial opinion also explained the practice as carried on by pathologists in Arkansas. *Arkansas Society of Pathologists v. Harris*, CCH Medicare & Medicaid Guide ¶ 30,546 (E.D.Ark.1980). Instead of requiring the pathologist to prove that hands-on services were provided, and then paying one bill of (say) $125, private insurers willingly pay 20 bills of $5 each, with the difference reflecting administrative savings. Although the Fund thinks that separate bills increase total costs and that the Medicare approach would reduce outlays, because the Hospitals would drive a hard bargain with Pathology Laboratories, other payors do not share this conclusion. Because the Fund knew the industry practice and what these bills represented, and because recoupment at this late date would be inequitable—the Fund's payment prevented Pathology Laboratories from billing the patients—the court denied the Fund's request for restitution. As for an injunction: the court observed that patients agreed when entering the Baptist Hospitals to pay all bills, whether or not the fees were covered by insurance, and it held that the coverage limitations in the Fund's Plan Document could not alter the patients' contractual commitments.

■ Let us start with this latter issue. The Fund submits that Judge Duff's decision means that Pathology Laboratories do not render medical services to the Hospitals' patients, and that ERISA prevents any state court from ordering patients to pay bogus bills for services not rendered. Yet Judge Duff did not find that Pathology Laboratories was submitting fraudulent bills. He concluded, rather, that the professional component does not represent "treatment" within the meaning of § 4.11 of the Plan Document because Pathology Laboratories cannot demonstrate that it provided hands-on services for any particular patient. That is a far cry from concluding that Pathology Laboratories is trying to pull a fast one. Pathology Laboratories provides supervisory services of value to all patients, and interpretation services of value to some. That its recordkeeping apparatus does not distinguish among them may be dispositive under § 4.11, but so what? Medical professionals provide many services for which insurance does not pay. A dental plan may pay for dentures but not crowns; a dentist who makes a crown still can bill the patient. A hospital plan may pay for a double room; a patient who requests a single room must expect to pay extra.

■ Nothing in ERISA prevents medical professionals from submitting—and state courts from enforcing—bills for services that are not covered by welfare benefit plans. Although ERISA preempts state law that "relates to" plans, 29 U.S.C. § 1144(a), that clause does not annul state laws of general applicability just because they affect the price of medical care. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, —— U.S. ——, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 831–32, 108 S.Ct. 2182, 2186–87,

100 L.Ed.2d 836 (1988); *Safeco Life Insurance Co. v. Musser*, 65 F.3d 647 (7th Cir. 1995). The law of contracts does not fetter welfare benefit plans, or indeed any activity. Willingness to enforce private bargains facilitates rather than regulates commerce. Arkansas does not seek to compel the Fund to cover any particular medical service, or to reimburse providers any particular amount. Just as the Federal Aviation Act does not preempt enforcement of contracts that set the effective price of air transportation, see *American Airlines, Inc. v. Wolens*, — U.S. —, — – —, 115 S.Ct. 817, 824–26, 130 L.Ed.2d 715 (1995), so ERISA does not preempt enforcement of contracts that specify who pays how much to whom for medical care. *Psychiatric Institute of Washington, D.C. v. Connecticut General Life Insurance Co.*, 780 F.Supp. 24, 32–33 (D.D.C.1992). Enforcing a contract between patient and medical provider bypasses the welfare plan; it is hard to see how ignoring a plan could "relate to" a plan.

■ Insurers and welfare benefit plans may respond with contractual offers of their own. For example, they may make reimbursement contingent on providers' agreement to charge lower rates and to forego compensation from patients. This is normal in "preferred provider" organizations. Or they may adopt copayment plans under which patients *must* pay extra, and providers are not entitled to accept the plan's reimbursement as full payment. See *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698 (7th Cir.1991). ERISA does not prefer one of these contractual models over the other, and it does not oblige federal courts to take over the entire subject of medical care. By refusing to pay Pathology Laboratories' bills, the Fund disabled itself from extracting a quid pro quo such as an end to supplemental direct billing. The district court therefore properly declined to issue an injunction that would regulate contracts between Pathology Laboratories and its patients. This in turn supports the decision to deny restitution, because it shows that Pathology Laboratories could have collected from the patients had the Fund stopped paying before November 1991. Restitution would leave Pathology Laboratories without compensation for five years of services to the Fund's participants.

■ Restitution by pension and welfare funds is governed by federal common law in the shadow of ERISA. See *Central States Health & Welfare Fund v. Neurobehavioral Associates, P.A.*, 53 F.3d 172 (7th Cir.1995); *UIU Severance Pay Trust Fund v. United Steelworkers of America*, 998 F.2d 509 (7th Cir.1993); 29 U.S.C. § 1132(a)(3). Federal common law tracks the consensus of states, which have developed the law of restitution, see *UIU Severance Pay Trust Fund*, 998 F.2d at 513. We therefore turn to the *Restatement of Restitution* (1937), which summarizes the dominant themes of state common law. See also *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–15, 109 S.Ct. 948, 954–57, 103 L.Ed.2d 80 (1989) (looking to the *Restatement of Trusts* as well as treatises on the state law of trust to flesh out the components of ERISA that bear the closest resemblance to trust law). And as § 1 of the *Restatement of Restitution* observes, restitution is a device to avoid unjust enrichment. A provider of medical care is not unjustly enriched by being paid the market fee for its services. The beneficiaries of the Fund's erroneous payments are the Fund's own participants, which avoided any need to compensate Pathology Laboratories for its services; yet the Fund has not sought restitution from them.

The Fund insists that it paid under a mistake of fact: it thought that Pathology Laboratories was supplying hands-on services ( = "treatment"), and it wasn't. To bolster this contention, the Fund points to a brochure from the College of American Pathologists, which the Fund depicts as offering a misleading description of professional-component billing. This sets up its appeal to the principle that sums paid under a mistake of fact are recoverable. E.g., *Hartford Accident & Indemnity Co. v. Chicago Housing Authority*, 12 F.3d 92, 97 (7th Cir.1993); *Harnischfeger Corp. v. Harbor Insurance Co.*, 927 F.2d 974 (7th Cir.1991). But the district judge found that the Fund knew the truth. Contrary testimony from the Fund's staff was deemed not credible. The district

court's finding is not clearly erroneous. See *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The Fund's staff was and is knowledgeable about compensation for medical care. It cannot have believed that bills of $2 to $5 per test represented the full charge for hands-on examination or interpretation. Nowhere in America have medical specialists' personal services been that cheap—not for a long, long time. Witnesses from Pathology Laboratories testified that they told the Fund's staff exactly how and for what services the firm billed. The Fund's own consultant conveyed the same information, yet the Fund continued to pay. Any mistake must have been one of law (that is, about the meaning of § 4.11) rather than of fact. But under § 45 of the *Restatement* the Fund's misinterpretation of its own governing documents does not permit it to recover payments made to someone with an "honest claim" to the money. Pathology Laboratories' claim to compensation is honest; the only question (from its perspective) was whether to bill the Fund or the patients. By paying until 1991, the Fund answered that question.

Almost in passing, the Fund points to Article 11.04 of its Plan Document, which provides that whenever it "has made payments exceeding the amount of benefits payable under the terms of this Plan, the Fund shall have the right to recover the excess payments from any responsible person or entity". Such a clause should be read broadly, the Fund insists, to facilitate prompt payment; for, if it is hard to reverse errors, then welfare benefit funds will tarry before paying, providers will respond by raising their prices to recover the time value of money, and plan participants will be worse off. We grant the advantages of speedy payment, but it does not follow that a welfare benefit fund acquires the right to change the interpretation of its plan after providers of services have relied to their detriment. The district court found that the Fund knew all along what the bills represented and in November 1991 changed its view of how such bills should be handled. A change in interpretation makes it hard to call earlier payments "excess." The clearest example of an "excess payment" is one with an extra zero or two added to the check by mistake (in *Neurobehavioral Associates*, for example, the plan paid $1,000 to a provider that submitted a bill for $10); a good example of a payment "exceeding the amount of benefits payable under the terms of this Plan" would be payment of $500 for a service capped at $400 in a schedule, or payment for a single room when the plan provides for shared rooms. None of these things occurred here; instead we have a change in policy followed by an effort to make the new approach retroactive. Article § 11.04 does not call for retroactivity, which would violate another important policy: "preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (Holmes, J., dissenting), quoted with approval in *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 80, 102 S.Ct. 851, 857, 70 L.Ed.2d 833 (1982). The real conflict is between the Fund and its participants; one or the other should pay Pathology Laboratories' bill, but the Fund wants to achieve a state in which neither has paid. Why should we leave physicians holding the bag? See, e.g., *City of Hope National Medical Center v. Superior Court*, 8 Cal.App.4th 633, 10 Cal.Rptr.2d 465 (Cal.App.1992). Sometimes jurisdictional rules, or statutes of limitations, or conflicts between plans (each with a plausible argument that the other is responsible), conspire to deprive medical providers of payment for real services, see *Foster McGaw Hospital v. Building Material Chauffeurs Welfare Fund*, 925 F.2d 1023 (7th Cir.1991), but in this case the court had a choice. The district judge allowed Pathology Laboratories to keep its payment, and properly so.

AFFIRMED.