In the
United States Court of Appeals
For the Seventh Circuit

Nos.   00-3648 and 00-3870

Operating Engineers Local 139 Health
Benefit Fund, et al.,

Plaintiffs-Appellants, Cross-Appellees,

v.

Gustafson Construction Corporation,

Defendant-Appellee, Cross-Appellant.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 96 C 956--Thomas J. Curran, Judge.

Argued June 6, 2001--Decided July 20, 2001


  Before Fairchild, Bauer, and Posner,
Circuit Judges.

  Posner, Circuit Judge.  The plaintiffs in this suit under ERISA and section 301 of the Taft-Hartley Act are nine multiemployer pension and welfare funds established pursuant to collective bargaining agreements. The funds are com plaining about delinquent contributions by a small Wisconsin construction company, between 1993 and 1998, and they appeal from a grant of summary judgment largely in the defendant's favor. The cross-appeal, which complains that the attorneys' fees awarded by the district court were excessive in view of the plaintiffs' lack of success on the merits, is premature on the view we take of the plaintiffs' appeal. There are some differences in the issues raised by the different funds, but for the sake of simplicity, and without affecting the legal analysis, we'll be able with one exception to confine our discussion to the fund related to the laborers' union.

  The defendant failed to make contributions during the four-year period covered by the complaint on the schedule set forth in its collective bargaining agreement with the union. This much is conceded, but the district court permitted the defendant to offset against

the fund's claim the amount by which the contributions sought by the fund exceeded the level of employer contributions specified in the 1991 collective bargaining contract. Although that contract expired in 1993, it contained an "evergreen" clause: if neither party terminated the contract, it would be renewed automatically. The union negotiated with other employers a successor contract increasing the amount of the required employer contributions, and submitted the new contract to the defendant too, but for unexplained reasons the defendant never signed it. Nevertheless the union billed the defendant for contributions at the new, higher rates specified in the successor contract--and the defendant paid, without a murmur (albeit often late), throughout the period embraced by the suit. It claims to have paid by mistake, having, it argues, by virtue of the evergreen clause no contractual obligation to contribute to the fund at any rate higher than that specified in the 1991 contract; and therefore it was entitled to the offset that the district court allowed it.

This is wrong on two grounds. The first is that the defendant's conduct in paying the higher rates uncomplainingly shows that it acquiesced in a modification of the 1991 contract, accepting at least so much of the successor contract that the union had tendered to it as established a new schedule of employer contributions to the fund. Nothing in the law of contracts requires that a contract, whether original or modified, must be signed to be enforceable. The contract needn't be in writing; if it is in writing, it needn't be signed, provided there's other evidence of acceptance, for example (a very pertinent example) by performance, In re Vic Supply Co., Inc., 227 F.3d 928, 932 (7th Cir. 2000); and if the contract is within the statute of frauds, a memorandum of the essential terms, signed by the party sought to be held to the contract, will suffice to make it enforceable. E.g., Consolidation Services, Inc. v. KeyBank National Ass'n, 185 F.3d 817, 819-20 (7th Cir. 1999). No statute of frauds defense is raised here--doubtless because the fund's partial performance, in paying benefits in accordance with the new schedule, took any contractual modification pursuant to

which they were paid out of the scope of the statute of frauds. E.g., C.L. Maddox, Inc. v. Coalfield Services, Inc., 51 F.3d 76, 79 (7th Cir. 1995); compare Connor v. Commissioner, 218 F.3d 733, 741 (7th Cir. 2000). And this would mean, under general common law principles, that all that was required to make a modification of the defendant's obligations enforceable was that it be supported by consideration, Contempo Design, Inc. v. Chicago & N.E. Ill. District Council of Carpenters, 226 F.3d 535, 550 (7th Cir. 2000) (en banc); United States v. Stump Home Specialties Mfg., Inc., 905 F.2d 1117, 1121-22 (7th Cir. 1990), and that acceptance of the modification be manifested with sufficient definiteness to enable a judge or jury to conclude with reasonable confidence that, yes, it was accepted. Autotrol Corp. v. Continental Water Systems Corp., 918 F.2d 689, 692 (7th Cir. 1990).

These are general common law principles that we've been reciting, however, and the common law that the federal courts have devised to govern disputes arising out of collective bargaining contracts and ERISA plans does not coincide at every point with the general law. For example, the rule whose vitality we questioned in Autotrol, id. that makes contractual clauses forbidding modification other than by a signed writing unenforceable is inapplicable to collective bargaining contracts for the reasons explained in Martinsville Nylon Employees Council Corp. v. NLRB, 969 F.2d 1263, 1267-68 (D.C. Cir. 1992), and even more clearly to ERISA plans. For while the plan itself doesn't have to be in writing, James v. National Business Systems, Inc., 924 F.2d 718, 720 (7th Cir. 1991); Jay Conison, Employee Benefit Plans in a Nutshell 199 (2d ed. 1998); but cf. Sandstrom v. Cultor Food Science, Inc., 214 F.3d 795, 797 (7th Cir. 2000) (though if it is established by a collective bargaining agreement the employer's required contributions must be specified in a written agreement, 29 U.S.C. sec. 186(c)(5)(B), in order to prevent diversion of pension fund moneys to union officials, Arroyo v. United States, 359 U.S. 419, 425-26 (1959)), modifications have to be in writing in order to protect the plan's financial integrity. Downs v. World Color Press, 214 F.3d 802, 805 (7th Cir. 2000); Plumb

v. Fluid Pump Service, Inc., 124 F.3d 849, 856 (7th Cir. 1997); Pohl v. National Benefits Consultants, Inc., 956 F.2d 126, 128 (7th Cir. 1992).

This purpose implies, it is true, a limitation to cases in which plan participants or beneficiaries are seeking larger benefits than the plan authorizes. See Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 875-76 (7th Cir. 1997); Pohl v. National Benefits Consultants, Inc., supra, 956 F.2d at 128. And that is not the case here. But this is of no moment, because despite appearances the issue here is not oral modification. The modified schedule of required contributions appears in the collective bargaining agreement that the union tendered to the defendant--a written agreement. That was an offer and the question is whether the defendant accepted the offer. Acceptance, as we noted earlier, can be manifested by conduct as well as by words. (For pertinent examples, see Robbins v. Lynch, 836 F.2d 330, 332 (7th Cir. 1988); Brown v. C. Volante Corp., 194 F.3d 351, 354-55 (2d Cir. 1999); compare Firesheets v. A.G. Building Specialist, Inc., 134 F.3d 729, 731-32 (5th Cir. 1998).) It was here. The overpayments that the defendant made to the fund month after month after month were not trivial--they averaged $1,375 a month, 18.5 percent of the average monthly remittance, and remember that the defendant is a small company (it hasn't told us how small). It is unlikely that the defendant, a corporation not a hapless individual, simply failed to notice that it was being billed for much greater contributions to employee welfare funds than called for in the 1991 contract.

We add for what it's worth (the parties make nothing of the point) that the monthly remittance reports accompanying these payments contained a declaration signed by the defendant that it "agree[d] to be bound by all of the provisions (including making payments) relating to pension, health & welfare and vacation funds, as contained in the Milwaukee area multi-employer labor agreements covering employees in the trade for which this report is made, for our employees in such trade, for the duration of such labor agreements, and, further, agree[d] to be bound by the applicable trust

agreements." Boilerplate it was, but it was entitled to some weight, Brown v. C. Volante Corp., supra, 194 F.3d at 354-55; but cf. Firesheets v. A.G. Building Specialists, Inc., supra, 134 F.3d at 732, and maybe a lot, as we suggested in Moriarty v. Larry G. Lewis Funeral Directors Ltd., 150 F.3d 773, 775 (7th Cir. 1998). People generally are held to the agreements they sign and are not permitted to fob them off as "boilerplate" without invoking fraud, unconscionability, or mutual mistake as a ground for walking away from their contract. Moriarty itself, however, suggests that the language we have quoted may be included on the remittance form merely to "assure the Funds that the contributions are lawful--for [as we noted earlier in this opinion] no employer may contribute to a union pension plan without a 'written agreement' under sec. 302(c)(5)(B) of the Labor-Management Relations Act, 29 U.S.C. sec. 186(c) (5)(B)." Id.

In any event, merely because a payment is made by mistake doesn't give the payor an automatic right to the return of the payment, and so doesn't conclude the issue of offset. The payor's rights are governed by the principles of the law of restitution. The propriety of the courts' incorporating those principles into the common law of ERISA cannot be doubted. Central States, Southeast & Southwest Areas Health & Welfare Fund v. Pathology Laboratories of Arkansas, P.A., 71 F.3d 1251, 1254 (7th Cir. 1995); Luby v. Teamsters Health, Welfare & Pension Trust Funds, 944 F.2d 1176, 1186 (3d Cir. 1991). Most of the federal circuits, ours included, have gone so far as to hold that these principles allow suits by employers for overpayments, even though ERISA does not explicitly create such a right of action, e.g., UIU Severance Pay Trust Fund v. Local Union No. 18-U, 998 F.2d 509, 512-13 (7th Cir. 1993); State Street Bank & Trust Co. v. Denman Tire Corp., 240 F.3d 83, 89 (1st Cir. 2001); Young America, Inc. v. Union Central Life Ins. Co., 101 F.3d 546, 548 (8th Cir. 1996); Jamail, Inc. v. Carpenters District Council of Houston Pension & Welfare Trusts, 954 F.2d 299, 304-05 (5th Cir. 1992); Plucinski v. I.A.M. National Pension Fund, 875 F.2d 1052, 1057-58 (3d Cir. 1989); contra, Dime Coal Co. v. Combs, 796 F.2d 394, 399 n. 7 (11th Cir.

1986), although it authorizes ERISA plans, within a tight time limitation, to return overpayments made as a consequence of a factual or legal mistake. 29 U.S.C. sec. 1103(c)(2)(A)(ii); Teamsters Local 639-Employers Health Trust v. Cassidy Trucking, Inc., 646 F.2d 865, 867 (4th Cir. 1981). The existence of jurisdiction over the claim for restitution is even less problematic here, since it is notadvanced as the basis for a lawsuit but merely as an offset to the fund's claims, which are for penalties and interest for delinquent contributions. Indeed, the claim of restitution here could easily be recharacterized as simply a defense of mistake, occasionally allowed in contract cases even when it is unilateral. See, e.g., Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164-65 (7th Cir. 1997); Building Service Employees Pension Trust v. American Building Maintenance Co., 828 F.2d 576, 578 (9th Cir. 1987); In re Rigden, 795 F.2d 727, 732 (9th Cir. 1986); Restatement (Second) of Contracts, sec. 153(a) (1981). American Building Maintenance was an ERISA case.

But jurisdiction does not imply merit. If restitution would be inequitable, as where the payor obtained a benefit that he intends to retain from the payment that he made and now seeks to take back, it is refused. (For the general principle, see Invest Almaz v. Temple-Inland Forest Products Corp., 243 F.3d 57, 66 (1st Cir. 2001), and for its application to claims based on overpayments to ERISA funds, Construction Industry Retirement Fund v. Kasper Trucking, Inc., 10 F.3d 465, 467 (7th Cir. 1993); Central States, Southeast & Southwest Areas Health & Welfare Fund v. Pathology Laboratories of Arkansas, P.A., supra, 71 F.3d at 1254-55; cf. Teamsters Local 639-Employers Health Trust v. Cassidy Trucking, Inc., supra, 646 F.2d at 867-68.) This is such a case. The higher contributions required under the successor contract were tied to higher pension and welfare benefits for the defendant's employees. This was a benefit to the defendant, since the greater the pension and welfare benefits the employees received, the less the employees were likely to demand in the way of wages. The market determines compensation, which is the sum of wages and fringe benefits, and so an increase

in one of these components will reduce the pressure on the employer to increase the other.

It is true that the record contains no evidence that the higher contributions demanded in the successor contract resulted in greater benefits actually received by the defendant's employees, but that is immaterial for two reasons. The first is that most of the benefits are in the nature of insurance or are otherwise contingent or (as in the case of pension benefits) deferred, so that immediate receipt is not expected; and insurance is not illusory just because the insured event never occurs. Second, had the defendant refused to contribute at the new rate to the fund, the union would undoubtedly have terminated the (automatically renewed) 1991 collective bargaining agreement, as it was entitled to do, thus depriving the defendant's employees of any pension and welfare benefits until the defendant knuckled under and signed the successor contract. By its apparent acquiescence in the benefits provisions of that contract, the defendant misled the union into thinking that the defendant was content with the new schedule of payments, and so the union forewent its alternative remedy of terminating coverage. The defendant's conduct precludes a claim for restitution.

We turn now to the funds' claim, not for the contributions that the defendant never paid--the district court allowed that claim though it whittled it down to very little with the offset that it erroneously granted--but for interest and penalties on the delinquent contributions. ERISA provides that in a suit for contributions the fund is entitled not only to the contributions but also to interest on them at the interest rate "provided under the plan" plus an amount equal to the greater of that interest or "liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the [unpaid contributions]." 29 U.S.C. sec. 1132(g)(2). The laborers' plan fixes the interest rate at the legal maximum or 1.5 percent a month (not compounded, the parties agree), whichever is lower. The plan also provides for liquidated damages

of 20 percent. The other plans provide only that a delinquent employer "shall be assessed liquidated damages and interest as determined by the Trustees," but the trustees had fixed the interest rate at 1.5 percent a month also and liquidated damages at 20 percent.

Holding without explanation that the 1.5 percent rate was "illegal," the court awarded interest to the fund at a 1 percent rate and required that the interest be calculated on a daily rather than, as sought by the fund, a monthly basis. The significance of this difference is that "calculated on a monthly basis" means that the employer would have to pay a full month's interest no matter how short the delinquency--it might be only a day--whereas the courtrequired the fund to prorate the interest according to the number of days of the delinquency. The court refused to award any liquidated damages at all. Its ground was that the fund had failed to show that 20 percent of unpaid contributions was a reasonable estimate of the damages caused to the fund by delay in payment, and therefore the so-called liquidated damages were actually a penalty and the common law does not permit penalty clauses in contracts.

The monthly calculation does seem a little odd, as it means that once the employer misses the due date of a contribution by one day (or one minute, for that matter), he might as well delay until the last day of the month, since his interest expense is no greater and so he gets a month's use of the money for zero interest. On the other hand the penalty for missing the due date by a day or a few days is greatly reduced by daily proration, which in the case of a delay of one day reduces the interest he must pay for being late from 1.5 percent (or 1 percent if the judge was right to cap the interest at that rate) to 1/28th to 1/31st of that amount, depending on the length of the month.

How these effects balance out so far as inducing prompt payment is not for us, or the district court, to decide, and our point in mentioning the different incentives created by the two methods of calculating interest is merely to confirm that neither is so crazy that it can be ruled out as arbitrary and capricious. We

think the plans must have intended to leave details of this sort to the discretion of the trustees. See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund, 882 F.2d 371, 376 (9th Cir. 1989); Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co., 749 F.2d 315, 321 (6th Cir. 1984). In fact we know it, because the plans provide that the trustees "shall have full power to construe the provisions of this Agreement, the terms used herein and the by-laws and regulations issued thereunder. Any such determination and any such construction adopted by the Trustees in good faith shall be binding upon all of the parties hereto and the Beneficiaries hereof. No matter respecting the foregoing or any difference arising thereunder or any matter involved in or arising under this Trust Agreement shall be subject to the grievance or arbitration procedure established in any collective bargaining agreement between the Association and the Union." And, further, "All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Trust Fund or the operation thereof . . . whether as to the construction of the language or meaning of the by-laws, rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise, shall be submitted to the Trustees . . . and the decision of the Trustees . . . shall be binding upon all persons dealing with the Trust Fund." (This is the language of one plan; the language of the others that appear in the record is similar.) This explicit grant of discretion brings into play the principle of Herzberger v. Standard Ins. Co., 205 F.3d 327, 331 (7th Cir. 2000), that explicit grants of discretion to plan administrators to construe the plan are judicially reviewable only for abuse of discretion, which is to say deferentially.

As for the district court's action in reducing the interest rate from 1.5 to 1 percent, there was no basis in law for that ruling either. The court may have been influenced by Wisconsin's usury law, which fixes 12 percent as the maximum interest rate with various exceptions two

of which are applicable here--the exception for corporations, Wis. Stat. sec. 138.05(5); Sundseth v. Roadmaster Body Corp., 245 N.W.2d 919, 921 (Wis. 1976), and the exception for cases in which a higher rate is authorized by other statutes. Wis. Stat. sec. 138.05(1). ERISA, whose framers were naturally concerned with the solvency of ERISA funds if only because the obligations of those funds to their participants and beneficiaries are (up to a point) insured by the federal government, see 29 U.S.C. sec. 1302(a); Artistic Carton Co. v. Paper Industry Union-Management Pension Fund, 971 F.2d 1346, 1348 (7th Cir. 1992), is a statute that, when interpreted in light of this purpose and the fact that employers are not consumers, clearly authorizes a higher rate, namely the rate that the parties agree to (here they agreed to delegate the fixing of the rate to the trustees of the fund). Cf. Iron Workers District Council of Western New York & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc., 68 F.3d 1502, 1508 (2d Cir. 1995). So the Wisconsin usury law is inapplicable by its own terms, and we therefore needn't decide whether, if applicable, it would be preempted by ERISA. It might not be if--but probably only if--the phrase "maximum rate permitted by law" in the plan was intended to incorporate the state's usury limit, as presumably the parties would be free to do. That is not argued.

As for applying the common law's doctrine making contract penalty clauses unenforceable to liquidated-damages provisions in ERISA plans, the doctrine obviously is not intended to apply to statutory penalties and if it did so apply, it would be preempted. See Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mechanical Contractors, Inc., 875 F.2d 212, 216-17 (9th Cir. 1989); In re Michigan Carpenters Council Health & Welfare Fund, 933 F.2d 376, 390 (6th Cir. 1991). Not only because by substituting a numerical limitation for the nebulous inquiry required by the common law ERISA has left little room for the common law doctrine usefully to occupy, but also and more important because section 1132(g)(2) is a penalty statute rather than a statute merely regulating contract damages. Central

States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1156 (7th Cir. 1989) (en banc); Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc., 960 F.2d 1339, 1341 (7th Cir. 1992). This is indicated by its permitting ERISA plans to choose between providing for liquidated damages and providing for double interest, the doubling being a penalty since it is arbitrary and inflexible rather than being an effort to estimate the likely damages to a particular fund in particular circumstances for particular delays. The statute thus provides alternative penalties, one of which is liquidated damages up to 20 percent (or even higher, if federal or state law permits, 29 U.S.C. sec. 1132(g)(2)-- another indication that state common law cannot be used to reduce the liquidated damages below 20 percent). So the fund was entitled to choose between double interest, that is, 18 percent x 2 = 36 percent, and single interest plus liquidated damages, 18 percent + 20 percent = 38 percent, and, naturally, it chose the latter combination, as was its right.

The interest and liquidated-damages provisions of ERISA apply, however, only to contributions that are unpaid at the date of suit (not the date of judgment, as argued by the defendant). Northwest Administrators, Inc. v. Albertson's, Inc., 104 F.3d 253, 257 (9th Cir. 1996); Iron Workers District Council of Western New York & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc., supra, 68 F.3d at 1506-07; Carpenters & Joiners Welfare Fund v. Gittleman Corp., 857 F.2d 476, 478 (8th Cir. 1988); contra, In re Michigan Carpenters Council Health & Welfare Fund, supra, 933 F.2d at 388-89. Some of the late contributions the defendant finally paid before the suit was brought, but their lateness violated the terms of the plan, thus entitling the fund to enforce the plan's provisions imposing interest and liquidated damages on delinquent contributions. Since section 1132(g)(2) is inapplicable to these claims, however, they must be adjudicated under common law--but federal common law, which governs the interpretation of ERISA plans, Franchise Tax Board v. Construction Laborers Vacation Trust for

Southern California, 463 U.S. 1, 24 n. 26 (1983); Central States, Southeast, Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 911 (7th Cir. 2000)--not Wisconsin common law. In re Michigan Carpenters Council Health & Welfare Fund, supra, 933 F.2d at 390; Idaho Plumbers & Pipefitters Health and Welfare Fund v. United Mechanical Contractors, Inc., supra, 875 F.2d at 215-18.

Carpenters & Joiners Welfare Fund v. Gittleman Corp., supra, 857 F.2d at 478-79, is contrary so far as liquidated damages is concerned--it holds that section 1132(g)(2) preempts liquidated damages for late, but not that late, contributions. We can't see the sense of that; the harm to the fund is not affected by the happenstance of when suit is brought in relation to the payment of the delinquent contributions--though if the Gittleman decision were correct it would give the delinquents a strong incentive to pay up when suit loomed!

The federal common law of ERISA may include a concept of unconscionability that would entitle an employer to complain if a fund's trustees used the power delegated to it by the plan to establish a completely exorbitant interest rate on delinquent contributions. No case says that, but it may be encompassed by the principle that the trustees are not to act in an arbitrary and capricious manner. However that may be, 1.5 percent a month (or 18 percent a year) is not unconscionable--or at least the defendant made no effort to show that it was so exorbitant as to be unconscionable in the circumstances, and it is too late now for it to attempt to do so. Indeed, it doesn't even call it "unconscionable," but merely "oppressive," which has no legal standing.

And while the ban on contractual penalties remains an established principle of the law of contracts, it is antiquated and should not be extended into ERISA-land--though two courts have done so already, see Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mechanical Contractors, Inc., supra, 875 F.2d at 217-18; In re Michigan Carpenters Council Health & Welfare Fund, supra, 933 F.2d at 390, solely on the basis of ambiguous legislative history.

It is easy to assign nonexploitive reasons for contractual penalties and hard to give convincing reasons why in the absence of fraud or unconscionability consenting adults that are, moreover, substantial organizations rather than mere consumers should be prohibited from agreeing to such provisions. We have sounded this note before and will not elaborate on it. See Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1160-61 (7th Cir. 1991); Lake River Corp. v. Carborundum Co., 769 F.2d 1284, 1289 (7th Cir. 1985). Although it is inapplicable to late contributions made before the suit was filed, ERISA's penalties provision provides guidance to what is a reasonable remedial scheme to incorporate into an ERISA plan and enforce in a suit to enforce the plan.

To summarize, the funds are entitled to relief in accordance with the analysis in this opinion, and so the judgment must be reversed and the case remanded. The cross-appeal is dismissed because attorneys' fees will have to be recomputed after the district court determines the amount of money that the defendant owes the plaintiffs.